# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| In re: Testosterone Replacement | ) | |
| Therapy Products Liability Litigation | ) | Case No. 14 C 1748 |
| Coordination Pretrial Proceedings | ) | MDL No. 2545 |
| | ) | |
| (This document applies to | ) | |
| *Mitchell v. AbbVie*, Case No. 14 C 9178) | ) | |

## CASE MANAGEMENT ORDER NO. 92
### (Memorandum Opinion and Order on post-trial motions in *Mitchell v. AbbVie*, No. 14 C 9178)

MATTHEW F. KENNELLY, District Judge:

Plaintiff Jesse Mitchell's case was the first "bellwether" case to be tried to a jury

verdict in this multidistrict litigation (MDL) proceeding.  Plaintiffs in the proceeding allege

that defendants, manufacturers of testosterone replacement therapy (TRT) drug

products, have misleadingly marketed their drugs.  According to plaintiffs, although TRT

products are considered safe and effective for the treatment of "classical

hypogonadism" (low testosterone levels in the blood and associated signs and

symptoms resulting from certain recognized medical conditions), defendants have

falsely represented in their marketing and promotional materials that TRT is safe and

effective for the treatment of age-related hypogonadism (low testosterone levels in the

blood and associated signs and symptoms resulting from the normal male aging

process).  Plaintiffs also assert that defendants failed to provide adequate warnings

about the risk that using TRT could increase venous thromboembolisms (blood-clotting

injuries in the veins) and cardiovascular injuries like heart attacks and strokes.  At trial,

Mitchell presented evidence in support of his contentions that AndroGel, a TRT drug

manufactured by defendants AbbVie Inc. and Abbott Laboratories (collectively, AbbVie),

caused him to suffer a heart attack and that he would not having taken AndroGel but for AbbVie's misleading marketing of the drug and failure to provide an adequate warning label.

Mitchell, an Oregon resident, asserted three claims against AbbVie under Oregon law: strict liability, negligence, and fraudulent misrepresentation. After deliberating for several hours following a 13-day trial, the jury returned a split verdict. On the strict liability and negligence claims, the elements of which Mitchell was required to prove by a preponderance of the evidence, the jury found in favor of AbbVie. On the fraudulent misrepresentation claim, the elements of which Mitchell was required to prove by clear and convincing evidence, the jury found in favor of Mitchell. But despite finding in Mitchell's favor on the fraudulent misrepresentation claim, the jury awarded him zero dollars in compensatory damages. And despite awarding zero dollars in compensatory damages, the jury awarded $150 million in punitive damages.

In their post-trial motions, both parties challenge aspects of the jury's verdict, though neither side takes issue with the jury's findings on the strict liability and negligence claims. AbbVie contends that it is entitled to judgement as a matter of law on the fraudulent misrepresentation claim, both because the evidence at trial was insufficient to support a finding of liability against AbbVie and because the jury's finding of zero compensatory damages means that Mitchell failed to prove an essential element of the claim. AbbVie also maintains that the punitive damages award should be vacated, both because it was not supported by the evidence at trial and because punitive damages may not be awarded in the absence of compensatory damages. Mitchell, for his part, argues that the evidence at trial supports the jury's liability verdict

on the fraudulent misrepresentation claim and its award of punitive damages. He contends, however, that the award of zero compensatory damages is contrary to the weight of the evidence presented at trial, and he urges the Court either to amend the judgment and award Mitchell the undisputed amount he paid in medical bills or to hold a new trial solely on the issue of compensatory damages. Neither party contends that the jury's verdict is internally inconsistent, but the Court noted this point when it first reviewed the parties' motions and asked them to address it in their response and reply briefs. For the reasons discussed below, the parties' attempts to reconcile the jury's findings are unconvincing. Because the Court concludes that the jury's findings are logically incompatible, the Court vacates the jury's verdict on the fraudulent misrepresentation claim and the compensatory and punitive damages awards and orders a new trial on that claim.

## Background

### A.     Evidence at trial

Neither party challenges the jury's verdicts on the strict liability or negligence claims, so for the purposes of this ruling, the Court focuses on the evidence presented in support of the fraudulent misrepresentation claim. At trial, Mitchell presented testimony from AbbVie employees and documentary exhibits of promotional materials tending to show that AbbVie marketed AndroGel for the treatment of age-related hypogonadism despite its knowledge that the drug had not been proven both safe and effective for that use. The evidence indicated that AbbVie sought to expand the market for AndroGel by directly communicating to physicians—through direct sales calls and face-to-face visits, distribution of physician treatment guidelines, and hiring of key

opinion leaders—that TRT was safe and effective for the treatment of age-related hypogonadism.

Mitchell also presented evidence showing that his own prescribing physician, Dr. Gordon Canzler, had been visited by AbbVie sales representatives on over 100 occasions and had received promotional materials touting TRT's safety and its effectiveness in treating age-related hypogonadism. Notes from sales calls to Dr. Canzler from AbbVie representatives indicated that Dr. Canzler was receptive to AbbVie's message, and Dr. Canzler testified that he considers sales representatives to be a valuable resource. As AbbVie notes, though, Dr. Canzler also testified that he based his particular prescribing decisions for individual patients on a combination of factors, including his own experience with a particular medication, rather than something a sales representative would have told him. For his part, Mitchell emphasizes that Dr. Canzler's testimony about his understanding of AndroGel's purported benefits echoes the representations in AbbVie's marketing that TRT is effective at improving stamina, strength, energy, and libido.

AbbVie denies that its marketing materials gave Dr. Canzler or Mitchell a false impression about AndroGel's risks or benefits, and AbbVie emphasizes Dr. Canzler's testimony that he told patients that TRT use presented a risk of heart attack. Dr. Canzler also testified, however, that at the time he prescribed AndroGel for Mitchell, he would not have mentioned testosterone as being a special risk factor for heart attack or stroke. And Mitchell himself testified that he had an expectation that AndroGel had been proven safe and effective for the treatment of his condition and that Dr. Canzler never warned him of the risk that AndroGel could cause him to suffer a heart attack.

According to Mitchell's testimony, he would not have taken AndroGel had he been aware that it could cause heart attacks.

To prove that AndroGel is generally capable of causing heart attacks and that it caused his own heart attack, Mitchell relied at trial on the expert testimony of Dr. Hossein Ardehali, a cardiologist at Northwestern Memorial Hospital in Chicago. Dr. Ardehali acknowledged that Mitchell's medical history revealed a number of risk factors for heart attack, apart from TRT use, including a 34-year history of smoking, high blood pressure, high cholesterol, high triglycerides, obesity, lack of exercise, and a family history of heart disease. And he conceded that those risk factors would be sufficient to cause Mitchell to suffer a heart attack even if he had never taken AndroGel. But Dr. Ardehali maintained that AndroGel was the cause of the heart attack Mitchell actually suffered. Specifically, he testified that the type of blood clot that caused the heart attack would be unlikely to occur in patients as young as Mitchell, and he opined that AndroGel likely worked synergistically with Mitchell's other preexisting risk factors to produce the blood clot that caused the heart attack.

There was no dispute between the parties at trial that the medical bills associated with Mitchell's heart attack amounted to $136,408. Mitchell also testified that the heart attack caused severe physical pain and put him out of work for three months and that his absence from work generated anxiety about his financial situation. According to Dr. Ardehali, Mitchell's heart attack has increased his risk of suffering a future heart attack, and Mitchell testified that this increased risk has been an additional source of anxiety.

**B.    Jury instructions and verdict**

The Court instructed the jury on the elements Mitchell was required to prove in

order for the jury to find in his favor on claims for strict liability, negligence, and fraudulent misrepresentation. The instruction for the fraudulent misrepresentation claim told the jury that it could find in Mitchell's favor only if he proved each of five elements by clear and convincing evidence: (1) "AbbVie made a false representation regarding a material matter[;]" (2) "AbbVie knew that the representation was false or made the representation recklessly, without knowing if it was true or false[;]" (3) AbbVie knew that it was misleading Mr. Mitchell and/or his physician, or recklessly disregarded whether it was misleading Mr. Mitchell and/or his physician[;]" (4) Mir. Mitchell and/or his physician reasonably relied on the representation[;]" and (5) "Mr. Mitchell was damaged as a direct result of his and/or his physician's reliance on the representation." Jury Instructions at 16. The next page of the jury instructions was titled "Causation" and stated that "[e]ach of Mr. Mitchell's claims requires him to prove by a preponderance of the evidence (for the first and second claims) or by clear and convincing evidence (for the third [fraudulent misrepresentation] claim) that AbbVie's conduct was a cause of his heart attack." *Id.* at 17.

The Court also instructed the jury on the issues of compensatory damages and punitive damages. Regarding compensatory damages, the instructions provided, among other things: "If you find in favor of Mr. Mitchell and against AbbVie on one or more of Mr. Mitchell's claims, then you must decide whether Mr. Mitchell has been damaged and, if so, the amount of his damages arising from his heart attack." *Id.* at 19. The Court further instructed the jury that Mitchell was seeking an award of punitive damages in addition to compensatory damages. The punitive damages instruction stated: "If you find that AbbVie's conduct was fraudulent, intentional, or willful and

6

wanton and that AbbVie's conduct proximately caused injury to Mr. Mitchell, and if you believe that justice and the public good require it, you may award an amount of money that will punish AbbVie and discourage it and others from similar conduct." *Id.* at 21. The instructions defined "willful and wanton conduct" as "a course of action that shows actual or deliberate intention to harm or that, if not intentional, shows an utter indifference to or conscious disregard for the safety of others." *Id.*

The jury found in favor of AbbVie on the strict liability and negligence claims and in favor of Mitchell on the fraudulent misrepresentation claim. With respect to damages, the jury awarded zero dollars in compensatory damages—writing in "0" in the spaces provided for non-economic damages and economic damages—and awarded $150,000,000 in punitive damages. After the Court excused the jury, counsel for AbbVie moved for immediate entry of judgment in AbbVie's favor based on the jury's award of zero dollars in compensatory damages. The Court entered judgment on the verdict the jury delivered and directed counsel for AbbVie to raise his contentions in an appropriate post-trial motion.

**C.    Post-trial motions**

Both parties have filed post-trial motions challenging the jury's verdict. Mitchell moves to amend the judgment under Federal Rule of Civil Procedure 59(e), contending that the jury's award of zero compensatory damages was against the weight of the evidence presented at trial. He maintains that the jury's finding of liability on the fraudulent misrepresentation claim is supported by the evidence at trial but that the Court should amend the compensatory damages award to account for the medical bills resulting from his heart attack, the amount of which is not in dispute. In the alternative,

he requests a new trial on the issue of compensatory damages.

AbbVie has filed its own motion under Rule 59(e), or in the alternative, under Rule 50(b). It asks the Court to strike the jury's punitive damages award, arguing that punitive damages may not be awarded in the absence of compensatory damages and that the evidence at trial does not support an award of punitive damages. In addition, AbbVie urges the Court to enter judgment in AbbVie's favor on the fraudulent misrepresentation claim. It argues that the jury found against Mitchell on a required element of that claim when it awarded zero compensatory damages and also that it is entitled to judgment as a matter of law on the claim based on the lack of evidence at trial. In the alternative, AbbVie asks the Court to enter a judgment of liability for Mitchell with an award of zero damages.

## Discussion

### A. Inconsistency of the verdict and the need for a new trial

On its face, the jury's verdict appears to be internally inconsistent. By finding for Mitchell on the fraudulent misrepresentation claim, the jury necessarily found that Mitchell proved each element of that claim by clear and convincing evidence, including that Mitchell "was damaged as a direct result of his and/or his physician's reliance on [AbbVie's false] representation." Jury Instructions at 16. But, it appears, by awarding zero compensatory damages, the jury also found that Mitchell had not "been damaged." *Id.* at 19 ("If you find in favor of Mr. Mitchell . . ., then you must decide whether Mr. Mitchell has been damaged and, if so, the amount of his damages arising from his heart attack."). Of course, it would violate the precepts of logic to assert simultaneously that a party has been damaged and has not been damaged. Ordinarily, "when jury verdicts

are logically incompatible, thereby indicating that the jury was confused or abused its power, the district court errs when it fails to order a new trial." *Stone v. City of Chicago*, 738 F.2d 896, 899 (7th Cir. 1984); *see also Thomas v. Stalter*, 20 F.3d 298, 303 (7th Cir. 1994) (remanding for new trial on liability and damages where "jury's finding of liability [was] in irreconcilable conflict with its award of zero damages").

Both parties deny that the jury's verdict is inconsistent. Each side seeks to reconcile the verdict by treating those aspects of the jury's verdict that it finds favorable as the jury's true or correct findings while treating the jury's unfavorable findings as legally erroneous or unreflective of the jury's intent. It is true that a court "must attempt to reconcile the jury's findings, by exegesis if necessary." *Gallick v. Baltimore & O. R. Co.*, 372 U.S. 108, 119 (1963). But a court can only harmonize the jury's answers if doing so is "possible under a fair reading of them." *Id.* What a court cannot do is "treat one verdict ([such as] the lack of a compensatory award) as the jury's 'true' disposition to which the other verdict must be confirmed." *Timm v. Progressive Steel Treating, Inc.*, 137 F.3d 1008, 1010 (7th Cir. 1998); *see also Am. Cas. Co. of Reading, Pa. v. B. Cianciolo, Inc.*, 987 F.2d 1302, 1305 (7th Cir. 1993) ("[T]here is no priority among inconsistent verdicts—the judge may not assume that the first answer is the 'authentic' one with which later answers must be reconciled.").

Both parties' attempts to provide a consistent account of the jury's verdict, and thereby avoid the need for a new trial on liability and damages, are unconvincing. Mitchell contends that the jury's finding in his favor on the fraudulent misrepresentation claim shows that the jury found by clear and convincing evidence that AbbVie's conduct caused his heart attack. Because the amount he paid in medical bills as a result of that

heart attack is undisputed, Mitchell contends that the award of zero compensatory damages is "clearly the result of an oversight." Pl.'s Mot. to Amend J. at 10. He urges the Court to correct that oversight by awarding him the undisputed amount of his medical bills or ordering a new trial on damages. But the Court may not treat the jury's finding with respect to the fraudulent misrepresentation claim as the "true" or "authentic" answer with which the compensatory damages award must be reconciled. "One could as readily say," as AbbVie does, that the award of zero damages requires a liability finding in AbbVie's favor. *Timm*, 137 F.3d at 1010. Mitchell points to cases in which courts have adjusted damages awards where the amount of damages was undisputed or required by law or where the jury clearly overlooked an item of evidence in its damages calculation. But none of those cases involved an award of zero damages that conflicted with, and thus called into question, the jury's liability verdict. *See, e.g.*, *Liriano v. Hobart Corp.*, 170 F.3d 264, 272 (2d Cir. 1999) (where jury found for plaintiff on liability and awarded damages, district court was permitted to increase award to account for hospital bill jury failed to include in its damages calculation); *Taylor v. Green*, 868 F.2d 162, 165 (5th Cir. 1989) (without establishing that he was entitled to compensatory damages, plaintiff proved that defendants violated his constitutional rights, in which case he was entitled by law to nominal damages); *LaSalle Nat. Bank v. Massachusetts Bay Ins. Co.*, No. 90 C 2005, 1997 WL 619856, at *3 (N.D. Ill. Sept. 30, 1997) (ordering new trial on issues of damages where liability verdict was "unassailable" but amount of damages apportioned to each plaintiff was nonsensical and against weight of evidence at trial).

Just as the Court may not give priority to the jury's finding that Mitchell was

damaged for purposes of the fraudulent misrepresentation claim, the Court may not, as AbbVie proposes, treat the award of zero compensatory damages as the jury's "authentic" finding that negates the liability verdict. The three district court cases AbbVie relies upon to advance this argument are either unpersuasive or do not support its position. In *Ira Green, Inc. v. Military Sales & Service Co.*, No. CAQ 10-207-M, 2013 WL 5912525, at *2 (D.R.I. Oct. 16, 2013), the district court determined that it was a clerical mistake to enter judgment for the plaintiff on its defamation claim where damages were an essential element of that claim and the jury had concluded that the allegedly defamatory statements had not resulted in any damages. Unlike in this case, the jury in *Ira Green* was not asked to answer the general question of whether the plaintiff had satisfied every element of his claim (including damages). Rather, "the defamation questions broke out the damages element[,] and the jury answered 'none' to that final question [of what damages, if any, resulted from the defamation]." *Id.* The jury's verdict in that case clearly indicated, without any inconsistency, that the plaintiff had proven most, but not all, of the elements of his claim, and it was thus appropriate to enter judgment in the defendant's favor on that claim. *Id.*

AbbVie cites two cases in which courts appeared to vacate a jury's liability finding because the jury simultaneously awarded zero compensatory damages, but neither court's reasoning is persuasive. *See Strange v. Collins*, No. 04-4017, 2007 WL 1412541, at *2 (C.D. Ill. May 7, 2007); *Calderon v. Perfect Equip. & Prod. Supply, Inc.*, No. CIV.05-2179 RLA, 2008 WL 3992784, at *1 (D.P.R. Aug. 22, 2008). In *Strange*, the magistrate judge reasoned that "because damages are an essential element of a tort claim, the finding of zero damages means that plaintiffs failed to meet their burden of

proof[,]" despite the jury's finding in favor of one of the plaintiffs on his defamation *per se* claim under Illinois law. *Strange*, 2007 WL 1412541, at *2. The magistrate judge cited no authority in support of that conclusion and did not mention whether the jury was instructed that damages was an essential element of the plaintiff's defamation *per se* claim. The Court is skeptical that the jury in that case would have been instructed that damages was an essential element, given that a "plaintiff need not plead or prove actual damage . . . to recover" for defamation *per se* under Illinois law. *Bryson v. News Am. Publications, Inc.*, 174 Ill. 2d 77, 87, 672 N.E.2d 1207, 1214 (1996). In any event, because there is no discussion in *Strange* of whether the jury's findings were consistent in light of the instructions given, the decision carries no persuasive weight. In *Calderon*, the jury found in favor of the plaintiff for her claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 20003-2(a), but the court vacated the jury's award of punitive damages because the jury did not award any compensatory damages. *Calderon*, 2008 WL 3992784, at *1. But in vacating the punitive damages award, the court also, without any explanation, vacated the entire judgment. Without an explanation of why the court vacated the jury's liability award, *Calderon* also has no persuasive value.

AbbVie attempts to reconcile the jury's findings not by attributing one or more of its answers to oversight but by parsing the language of the jury instructions to find an interpretation of those instructions that would render the jury's findings consistent. Despite AbbVie's efforts, however, the Court concludes that the jury's findings cannot be considered consistent under any "fair reading" of the instructions and the jury's findings. *Gallick*, 372 U.S. at 119.

AbbVie first attempts to harmonize the jury's findings by pointing to the following

portion of the jury instruction on compensatory damages: "If you find in favor of Mr.

Mitchell and against AbbVie on one or more of Mr. Mitchell's claims, then you must

decide *whether* Mr. Mitchell has been damaged and, *if so*, the amount of his damages

arising from his heart attack." Jury Instructions at 19 (emphasis added). AbbVie

contends that the jury might have inferred from that instruction that it could find for

Mitchell on liability without finding that he suffered any damages. Read in isolation, the

quoted portion of the jury instruction may have been drafted inartfully.[1] But AbbVie's

proposed account of the jury's reasoning cannot be squared with the jury instructions as

a whole, which is how the instructions must be considered. The instruction on

compensatory damages stated that the jury need not consider the issue of

compensatory damages unless it found in favor of Mitchell on one of his claims. And

the instruction regarding the elements of the fraudulent misrepresentation claim, the

claim in which the jury found in Mitchell's favor, contained a clear and unequivocal

statement that one of the elements of fraudulent misrepresentation was a finding that

Mitchell "was damaged." *Id.* at 16. That is, in order for the jury to find in Mitchell's favor

on the fraudulent misrepresentation claim, thereby presenting the need to consider the

question of the amount of damages to award, the jury had to find that he "was

damaged." In addition, the instruction labeled "causation" emphasized to the jury that

each of Mitchell's claims, including the fraudulent misrepresentation claim, required him

to prove that AbbVie's conduct was a cause of his heart attack.[2] Thus the notion that

the jury must have believed it could find in favor of Mitchell on the fraudulent

---

[1]     In retrospect, it might have made more sense to use the term "injury" in the elements instructions for the various claims and the term "damages" only in the damages instructions, but no party made such a request.

[2]     The Court discusses AbbVie's response to this point below.

misrepresentation claim without finding that he suffered any damages is directly inconsistent with at least two express provisions of the instructions. In addition, the instruction regarding punitive damages clearly stated that the jury could award punitive damages only if it found that AbbVie's conduct has proximately caused injury to Mitchell. Thus AbbVie's theory that the jury found in Mitchell's favor despite finding that he suffered no damages is also inconsistent with the jury's award of punitive damages.

AbbVie next contends that the jury could have understood the word "damaged" to have different meanings in the instruction on the elements of fraudulent misrepresentation and in the instruction on compensatory damages, such that there is actually no conflict between the jury's findings on those issues. According to AbbVie, for purposes of its liability finding on the fraudulent misrepresentation claim, the jury could have found that Mitchell was "damaged" in the conventional sense that he in fact suffered *some form* of harm, while simultaneously, for purposes of compensatory damages, finding that the harm he suffered was not *economically compensable* and thus did not constitute "legal damages." In addition to its reliance on the fact that the term "damaged" has these two different meanings in common usage, AbbVie points out that the instruction on compensatory damages stated that if the jury found in Mitchell's favor and found that he had been damaged, the jury would have to consider only "the amount of his damages arising from his heart attack." *Id.* at 19. By contrast, the damages element included in the instructions for the fraudulent misrepresentation claim stated only that the jury had to find that Mitchell "was damaged as a direct result of his and/or his physician's reliance on the representation." *Id.* at 16. Thus, AbbVie contends, the limitation on the type of compensatory damages the jury could award

provides a way to reconcile the jury's verdict: the jury must have found that Mitchell was damaged in some way as a result of his or his physician's reliance on AbbVie's misrepresentations but must not have found that AbbVie caused any injury arising from his heart attack.

Though AbbVie's attempt to reconcile the jury's verdict appears plausible at first glance, there are at least two problems with its account. First, AbbVie does not provide an example of the type of non-compensable damage the jury might have found Mitchell to have suffered "as a direct result of his and/or his physician's reliance" on AbbVie's alleged misrepresentation. AbbVie does not, and hardly could, contend that a heart attack requiring medical treatment is a not an economically compensable injury. And Mitchell does not allege, and did not present evidence at trial of, any harm or damage apart from the heart attack he suffered and harms associated with that injury. Thus even if the Court could read the jury's verdict as finding that Mitchell suffered some harm other than a heart attack, that would not be a "theory consistent with the evidence" at trial. *E.E.O.C. v. Mid-Continent Sec. Agency, Inc.*, No. 99 C 5381, 2001 WL 800089, at *2 (N.D. Ill. July 12, 2001) (Kennelly, J.).

Second, AbbVie's theory—that the jury found Mitchell suffered some harm other than his heart attack as a result of his reliance on AbbVie' misrepresentations—is directly at odds with the Court's instruction on causation. That instruction provided that "[e]ach of Mr. Mitchell's claims requires him to prove . . . by clear and convincing evidence (for the [fraudulent misrepresentation] claim) that AbbVie's conduct was a cause of his heart attack." Jury Instructions at 17. Thus, based on that instruction, the jury could not enter a liability verdict for Mitchell on the fraud claim without finding that

AbbVie's conduct caused his heart attack, as opposed to some other unspecified injury.

AbbVie concedes that the causation instruction indicated that the jury had to find that AbbVie's conduct caused Mitchell's heart attack in order to enter a liability verdict on the fraudulent misrepresentation (or any other) claim. AbbVie contends, however, that it is possible that the jury found that AbbVie's conduct caused Mitchell's heart attack but that the heart attack was not the "direct result of his and/or his physician's reliance" on AbbVie's misrepresentation for purposes of the fraud claim. On this proposed interpretation, the jury would have had to find that Mitchell's and/or his physician's reliance on AbbVie's misrepresentation caused some unspecified harm other than Mitchell's heart attack (in order to find for Mitchell on the fraudulent misrepresentation claim) and that some other conduct of AbbVie's caused the heart attack. But this interpretation is also untenable. AbbVie does not explain what conduct of AbbVie's, other than its alleged misrepresentations, could have been the basis for the jury's finding that AbbVie's conduct caused his heart attack. It is difficult to imagine what other conduct the jury could have believed was the cause of Mitchell's heart attack, especially in light of the jury's findings in *AbbVie's favor* on the claims for negligence and strict liability. In addition, AbbVie's proposed interpretation does not explain how the jury could consistently award zero compensatory damages. To comply with the causation instruction, the jury would have to find that AbbVie's conduct caused Mitchell's heart attack in order to find for him on the fraudulent misrepresentation claim. But, as discussed above, the jury could not then conclude, consistently, that "the amount of damages arising from his heart attack" was zero.

In a footnote, AbbVie says that the jury might have understood a finding of

causation not to be an element of his fraudulent misrepresentation claim but rather a prerequisite to awarding compensatory damages. AbbVie says this account is plausible because the causation instruction came after the fraudulent misrepresentation instruction but before the compensatory damages instruction. This is not a plausible interpretation of the verdict. The causation instruction expressly provided that causation was an element of each of Mitchell's claims. *See* Jury Instructions at 17 ("Each of Mr. Mitchell's *claims* requires him to prove . . . that AbbVie's conduct was a cause of his heart attack.") (emphasis added). And even if one were to accept AbbVie's hypothesis that the jury understood the causation instruction to apply only to issues discussed later in the instructions, AbbVie does not explain why the jury would believe that inadequate evidence of causation precluded an award of compensatory damages but still permitted an award of punitive damages. (Both damages instructions came after the causation instruction.)

AbbVie points to cases in which courts have reconciled a finding of liability with an award of no compensatory damages, but those cases differ from this one in important respects. Significantly, in this case, the Court instructed the jury that damage to Mitchell was a necessary element of his claim. The case is unlike a breach-of-contract case, for example, where it is possible for a jury to find that the defendant breached its obligations without injuring the plaintiff. *See Prime Choice Servs., Inc. v. Schneider Logistics Transloading & Distribution, Inc.*, 861 F.3d 633, 635 (7th Cir. 2017). A jury in a case like that could conclude, for example, that the plaintiff failed to mitigate the damages that allegedly resulted from the breach. *See id.* There is no similar theory that would reconcile the jury's findings in this case.

The Fourth Circuit's unpublished opinion in *Vigilant Insurance Co. of New York v. McKenney's Inc.*, 524 F. App'x 909 (4th Cir. 2013), which AbbVie cites, does address an award of zero damages in the context of a liability finding on a negligence claim, for which damages or injury was a necessary element. But that case resembles the *Ira Green* case discussed above and is distinguishable for the same reason. In *Vigilant*, the trial court had instructed the jury that any failure to exercise due care would "constitute negligence or carelessness" and that if the jury found that negligence or carelessness existed, it would have to determine whether the negligence or carelessness was a proximate cause of the damages sustained by the plaintiff. *Id.* at 913 n.4. Among other things, the verdict form in that case asked the jury to issue a verdict on the "claim for negligence" and then to state the amount of damages, "if any" to which the plaintiff was entitled if it prevailed on one of its claims. *Id.* at 912–13. As in *Ira Green*, the court in *Vigilant* concluded that the instructions could "reasonably be understood to have split the elements of negligent conduct from the element of negligence damages, telling the jury that if it first found [the defendant] to have been negligent, it should then proceed to consider whether [the plaintiff] was entitled to damages." *Id.* at 912. That reconciling interpretation was possible in *Vigilant* because of the dual meanings of negligence: carelessness or breach of the duty of care, on one hand, and a complete tort with necessary elements, including damages, on the other hand. Because of these two meanings, the jury could have reasonably concluded that it could find in favor of the plaintiff on its "claim for negligence" if it found that the defendant acted negligently, without finding that the negligence caused the plaintiff any injury. By contrast, in this case, the instructions made clear that to find in favor of

Mitchell on his claim for fraudulent misrepresentation, the jury had to find that he proved each element, including damage, by clear and convincing evidence.

The irreconcilable conflict between the jury's finding of liability on the fraudulent misrepresentation claim and award of zero compensatory damages requires a new trial on this claim. *See Thomas*, 20 F.3d at 303. Because the jury's punitive damages award depends upon, at least, the viability of the jury's liability finding, the Court must vacate that award as well. Mitchell argues that the Court can limit a new trial to the issue of compensatory damages, but none of his cited authority supports limiting a new trial to that issue. In *Rosario v. Livaditis*, 963 F.2d 1013, 1022 (7th Cir. 1992), the Seventh Circuit remanded for a new trial solely on the issue of damages, because an award of zero damages was contrary to law and inconsistent with the jury's finding of liability on the claims the plaintiffs brought under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. But unlike this case, there was no need for a retrial on liability in *Rosario*, because the jury's liability finding was supported by ample evidence in the record and was "left . . . unchallenged" by the defendants. *Rosario*, 963 F.2d at 1022. In the other cases Mitchell cites, new trials were appropriately limited to the issue of damages because the erroneous damages awards were not inconsistent with, and thus did not call into question, the jury's liability findings. *See McClain v. Owens-Corning Fiberglas Corp.*, 139 F.3d 1124, 1127 (7th Cir. 1998) (not abuse of discretion to order new trial on damages based on determination that $100,000 was inadequate and against weight of evidence in wrongful death case); *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 561 (7th Cir. 1996) (no error where district court ordered new trial on damages after determining that victim of intentional discrimination on the basis

of disability was entitled to more than $1,000 in damages); *LaSalle Nat. Bank v. Massachusetts Bay Ins. Co.*, No. 90 C 2005, 1997 WL 619856, at *4 (N.D. Ill. Sept. 30, 1997) (ordering new trial on damages where liability verdict was "clear and consistent with the evidence," but jury verdict on damages "ma[de] no sense"); *Proler v. Modern Equip. Co.*, 602 F. Supp. 1388, 1393 (E.D. Wis. 1985) (ordering new trial on damages where jury's liability finding on patent infringement claim was supported by evidence in record, but damage award of $75 million offended common sense).

Though neither party requests a new trial on liability and damages, Rule 59(d) "empowers a judge to order a retrial 'for any reason that would justify granting one on a party's motion.'" *U.S. ex rel. Pileco, Inc. v. Slurry Sys., Inc.*, 804 F.3d 889, 892 (7th Cir. 2015) (quoting Fed. R. Civ. P. 59(d)). Although this order comes later than 28 days after the entry of judgment (the time period in which the Court may order a new trial on its own motion), a court is also permitted to grant a Rule 59 motion for a new trial for a reason not stated in a the party's motion. Fed. R. Civ. P. 59(d) (requiring court to give parties notice and opportunity to be heard and to specify reasons for new trial in its order). Mitchell filed a timely motion for a new trial, and the Court notified both sides during the August case management conference that they should address the issues of whether the verdict was inconsistent and whether a new trial should be ordered. Neither party contends that the Court lacks the authority to order a new trial on its own motion, and the Court appears to have satisfied the requirements of Rule 59(d). In addition, the Court concludes that it would be committing an error if did not order a new trial, *Stone*, 738 F.2d at 899, and that it is therefore appropriate to order a new trial on Mitchell's fraudulent misrepresentation claim and on damages relating to that claim.

**B.**     **Evidence in support of the finding against AbbVie on Mitchell's fraudulent misrepresentation claim**

As discussed above, the Court does not believe that the jury's award of zero compensatory damages entitles AbbVie to judgment as a matter of law on the fraudulent misrepresentation claim. The jury's compensatory damages award is, indeed, in conflict with the finding required by its liability verdict that Mitchell "was damaged," but it would be impermissible to assume that the finding implied by the jury's damages award "is the 'authentic' one." *Am. Cas.*, 987 F.2d at 1305.

AbbVie advances a second reason why it is entitled to judgment as a matter of law on the fraudulent misrepresentation claim: it contends that Mitchell failed to present sufficient evidence at trial to allow a reasonable jury to find in his favor on each element of the claim. If AbbVie is correct, the Court would enter judgment as a matter of law on the fraudulent misrepresentation claim (and also vacate the punitive damages award), and there would no longer be any inconsistency to resolve. *See id.* ("A judge may dissipate the inconsistency [in verdicts] by setting aside one of the conflicting verdicts, if that verdict was unsupported by the evidence.").

To grant a motion for judgment as a matter of law, a court must find that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party." Fed. R. Civ. P. 50(a)(1). When considering a Rule 50 motion, a court must view the evidence presented at trial "in the light most favorable to the party that prevailed, drawing all reasonable inferences in [his] favor." *Jamsports & Entm't, LLC v. Paradama Prods., Inc.*, 382 F. Supp. 2d 1056, 1058 (N.D. Ill. 2005) (Kennelly, J.) (citing *Filipovich v. K & R Exp. Sys., Inc.*, 391 F.3d 859, 863 (7th Cir. 2004)).

The Court finds that the evidence at trial would permit a reasonable jury to find

that Mitchell proved each element of his fraudulent misrepresentation claim by clear and convincing evidence. AbbVie argues that Mitchell failed to present any evidence showing that AbbVie "made a material misrepresentation that was false." *Strawn v. Farmers Ins. Co. of Oregon*, 350 Or. 336, 352, 258 P.3d 1199, 1209 (2011). Though acknowledging that Mitchell put forth evidence suggesting that AbbVie's marketing was misleading, AbbVie says Mitchell failed to identify any "actual false representations." Defs.' Mot. at 16. The Court understands AbbVie to be arguing that Mitchell did not identify any *express* representations that were false. But under Oregon law, a plaintiff may bring a claim for fraudulent misrepresentation "even though the [alleged] misrepresentation is only implied." *Ogan v. Ellison*, 297 Or. 25, 34, 682 P.2d 760, 765 (1984); *Heverly v. Kirkendall*, 257 Or. 232, 234, 478 P.2d 381, 382 (1970) ("Misrepresentation may be made by statements which are literally true but under the circumstances create a false impression."). Mitchell therefore was not required to identify an express statement about AndroGel that was false. A reasonable jury could have credited, among other things, the opinion of Mitchell's expert, Dr. David Kessler, that by touting the ability of TRT to treat age-related hypogonadism, AbbVie falsely represented that AndroGel was safe and effective for that use.

A reasonable jury could also find that Dr. Canzler's reliance on AbbVie's representations caused him to prescribe, and caused Mitchell to use, AndroGel. AbbVie emphasizes that Dr. Canzler could not recall any particular TRT marketing materials he received from TRT manufacturers, as well as his testimony that he made his describing decisions for Mitchell on the basis of his own training, experience, and medical judgment. But a reasonable jury could have concluded—based on the number

of interactions between Dr. Canzler and AbbVie sales representatives, notes indicating that sales representatives viewed him as "receptive" to their message, his testimony that sales representatives can be a valuable resource, and the similarity between his understanding of TRT's benefits and the benefits promoted in AbbVie's marketing materials—that AbbVie's representations about AndroGel's safety and efficacy for the treatment of age-related hypogonadism played a significant role in Dr. Canzler's prescribing decisions. AbbVie contends that representations about age-related hypogonadism are irrelevant to this case because Dr. Canzler never expressly diagnosed Mitchell with age-related hypogonadism. Dr. Canzler did testify, however, that he believed at the time he prescribed AndroGel that Mitchell's low testosterone was likely the result of aging, and thus AbbVie's age-related marketing is clearly relevant.

AbbVie also contends that its representations about AndroGel could not have caused Mitchell to use the drug because he decided to do so even after Dr. Canzler warned him that TRT use presented a risk of heart attack. But Dr. Canzler also testified that he would not have mentioned testosterone as being a special risk factor for heart attack at the time he prescribed AndroGel for Mitchell, and Mitchell did not recall any warning from Dr. Canzler about the risk of heart attack caused by using AndroGel. Indeed, he testified that he believed AndroGel was safe for him to use and that he would not have taken it had he been warned of the drug's cardiovascular risks. Based on that evidence, a reasonable jury could find by clear and convincing evidence that Dr. Canzler relied upon AbbVie's misrepresentations about AndroGel's safety and efficacy in the treatment of age-related hypogonadism and that his reliance caused Mitchell to use the drug.

A reasonable jury could also find, based on the evidence at trial, that Mitchell's use of AndroGel caused him to suffer a heart attack. AbbVie argues that no reasonable jury could find that AndroGel was a "but for" cause of Mitchell's heart attack, because Dr. Ardehali, Mitchell's only expert witness on the issue of causation, conceded that Mitchell's preexisting cardiovascular risk factors were sufficient to cause his heart attack even if he never took AndroGel. *See Joshi v. Providence Health Sys. of Oregon Corp.*, 342 Or. 152, 164, 149 P.3d 1164, 1170 (2006) (applying "but for" test and affirming directed verdict for defendant where plaintiff's expert could not testify "to a reasonable probability" that defendant's negligence caused plaintiff's stroke). But Dr. Ardehali's acknowledgement that Mitchell's other risk factors could have caused his heart attack is not inconsistent with a finding that the heart attack "would not have occurred but for [AbbVie's] conduct." *Id.* at 1169. Dr. Ardehali stated only that Mitchell's other risk factors could have caused his heart attack, not that they likely would have done so. What actually happened, according to Dr. Ardehali, is that AndroGel worked with the other risk factors to generate a blood clot that led to the heart attack. Dr. Ardehali based that opinion on his understanding of how TRT affects patients with preexisting risk factors, as well as his analysis of the particular type of blood clot that caused Mitchell's heart attack. A reasonable jury could have credited Dr. Ardehali's opinion that AndroGel was a cause of Mitchell's heart attack and found that it was clear and convincing evidence that Mitchell likely would not have suffered his heart attack but for his use of AndroGel.

The same evidence that would allow a jury to find in Mitchell's favor on the fraudulent misrepresentation claim would also provide a basis for the jury to determine

that AbbVie knowingly misrepresented the safety of AndroGel and therefore engaged in conduct that was "fraudulent" or showed a "conscious disregard for the safety of others" and that ultimately resulted in Mitchell's heart attack. Thus the Court also denies AbbVie's motion to set aside the punitive damages award for insufficient proof at trial.[3]

### Conclusion

For the reasons stated above, the Court grants in part and denies in part AbbVie's motion to strike the punitive damages award and for entry of judgment as a matter of law [dkt. no. 92], and grants in part and denies in part Mitchell's motion to amend the judgment or in the alternative for a new trial [dkt. no. 93]. The Court vacates the judgment in part, specifically the finding entered in favor of Mitchell on the claim for fraudulent misrepresentation and the award of punitive damages. The Court orders a new trial on Mitchell's claim for fraudulent misrepresentation, including damages relating to that claim. The trial is set for March 5, 2018 at 9:45 a.m. The final pretrial conference is set for February 28, 2018 at 3:30 p.m.


Date: December 22, 2017 _____
                              MATTHEW F. KENNELLY
                              United States District Judge

---

[3]      Because the Court is vacating the punitive damages award as a result of the verdict's inconsistency, it need not reach the question, in this ruling, of whether a punitive damages award can stand in the absence of an award of compensatory damages.